## STATE OF LOUISIANA et al. v. ATLAS PIPELINE CORPORATION.

### No. 6203.

District Court, W. D. Louisiana, Shreveport Division.

Feb. 2, 1940.

John H. Tucker, Jr., of Shreveport, La., for receiver.

John M. Madison, of Shreveport, La., for Atlas Pipeline Corporation.

Edw. A. G. Porter, of Philadelphia, Pa., and Fred Simon, of Shreveport, La., for Pennsylvania Co., trustee for Second Bond Issue.

Noah A. Stancliffe, of New York City, and Fred Simon, of Shreveport, La., for Second Mortgage Bondholders Committee.

E. Leland Richardson, of Baton Rouge, La., for State of Louisiana.

J. N. Marcantel, of Shreveport, La., for ordinary creditors.

John L. Crawford, of Fort Worth, Tex., for Securities and Exchange Commission.

Elias Goldstein, of Shreveport, La., for First Trust Co. of Philadelphia, trustee for First Mortgage Bondholders and First Mortgage Bondholders Protective Committee.

DAWKINS, District Judge.

The Atlas Pipeline Corporation is in the process of reorganization under Chapter 10 of the Bankruptcy Law (11 U.S.C.A. § 501 et seq.), commonly referred to as the Chandler Act. On November 24, 1939, an open court hearing was had upon many matters, some of which were disposed of at the time and others were submitted upon the record and briefs subsequently to be filed. The questions to be decided at this time are as follows:

(1) Motion to dismiss the petition of the Collector of Revenue for the State of Louisiana, filed November 22, 1939;

(2) Whether the State of Louisiana has a lien supporting its claim for gasoline taxes which had accrued, and as it alleges were collected from other persons by the debtor before any proceedings in this court were had;

(3) Whether what is referred to as the Gilark-Cotton Valley ten mile six-inch

pipeline is covered by the general first and second mortgages upon the property of the debtor.

1. As to the motion to dismiss, the State first filed its proof of claim, asserting a lien, and subsequently a formal petition, setting up the nature of its claim at length, amounting to $141,775.08, with attached exhibits, showing a recordation of the alleged lien in the mortgage records and praying for its recognition as superior "to the claims of all other creditors, including holders of claims secured by mortgage on any of the assets of the corporation." In the alternative, it asked for an accounting of the monies collected as taxes, and further alternatively, that it be paid the sum of $15,000 as having been "erroneously taken into the account of the receivership" in this court. The reorganization trustee, the trustee for the first mortgage bondholders and the attorney for ordinary creditors have all moved to dismiss this petition upon the following grounds:

"1. The relief sought and the procedure of its seeking are not authorized by Chapter X of the Act of Congress relating to Bankruptcy.

"2. Substantially all of the issues raised in said petition are now before this court on the proof of claim filed on behalf of the State of Louisiana, and the opposition filed thereto by the movers herein."

While it is true that claims in proceedings of this kind, similarly to those in ordinary bankruptcy are proven to forms in bankruptcy or as the court may prescribe, I see no reason why, in view of the character of the State's claim, it should not be permitted to file its pleading setting up fully the nature thereof and the basis upon which it asserts a lien. I do not believe it has affected the rights of anyone connected with the matter, and that the issue which the court must determine, primarily, is the one of whether the State has a lien, and if so, the assets upon which it operates, as well as its effect as to prior mortgage creditors. There is no occasion to try the matter as a separate proceeding. In fact, stipulations have been filed as to all the facts affecting this claim, and the court will now proceed to dispose of it. For these reasons, I think the motion to strike should be denied.

2. The facts with respect to the claim of the State for gasoline taxes have been stipulated and are quoted so far as necessary, as follows:

"3. That the property of said Atlas Pipeline Corporation, situated within the Parish of Caddo, State of Louisiana, consists mainly of a refinery, cracking plant, and equipment located on approximately 168 acres of land, together with that part of the pipeline, telegraph and telephone lines and equipment which begins at the refinery site and extends through the Parish of Caddo into the states of Texas and Arkansas; that the offices of the Atlas Pipeline Corporation are likewise maintained in the City of Shreveport, Parish of Caddo, State of Louisiana.

"4. That the said Atlas Pipeline Corporation from December 1, 1938, and prior thereto, and at the present time is a dealer in gasoline and kerosene within the meaning of the provisions of Act 6 of the Extra Session of the Legislature of Louisiana for 1928, as amended by Act 8 of 1930, as amended by Act 16 of 1932, as amended by Act No. 34 of 1934; that it is also a dealer within the meaning of Act No. 1 of the Extra Session of the Legislature of Louisiana for the year 1930, and Act No. 87 of the Regular Session of the Legislature of Louisiana for the year 1936; that it is a dealer within the meaning of the provisions of Act No. 14 of 1932.

"5. That the said Atlas Pipeline Corporation is engaged in business in Louisiana, particularly Caddo Parish, of manufacturing gasoline and other products of crude petroleum, which gasoline and kerosene it sells, handles and distributes in the State of Louisiana.

"6. That in making sales of gasoline and kerosene manufactured by it in the State of Louisiana, the said Atlas Pipeline Corporation issues invoices to its vendees for said gasoline and kerosene, and photostats of typical invoices are attached hereto and made part hereof. It is admitted that said photostats are true and correct and are typical of all other invoices issued by said corporation during said period, namely December 1, 1938 to and including May 26, 1939, when gasoline and kerosene have been sold.

"7. That all invoices issued to all vendees by said corporation, where sales of gasoline and kerosene were involved during said period, listed and itemized on said invoices the prices of said gasoline and kerosene, and as a separate item showed the taxes due the State of Louisiana and other Governmental agencies, as shown by

the photostats attached hereto and made part hereof.

"8. It is further admitted that during the period hereinabove set out, namely December 1, 1938, to and including May 26, 1939, the Atlas Pipeline Corporation collected the full amount of all of its invoices, representing the sale of gasoline and kerosene, and collected all of the amounts shown on said invoices as taxes; that said amounts collected and shown as taxes on said invoices, were deposited to the general fund of the corporation in banks in the City of Shreveport, Louisiana.

"9. That the said Atlas Pipeline Corporation, during the period from December 1, 1938, to May 26, 1939, collected on its invoices listed as taxes, the sum of One hundred forty-one thousand, seven hundred seventy-five thousand dollars and eight cents ($141,775.08), and did not remit same to the State of Louisiana but deposited same in its general fund in the banks in Shreveport, and used same in the operation of its business, paying obligations of said corporation with said funds.

"10. That the Atlas Pipeline Corporation was placed in receivership by this Court on May 26, 1939, on petition of the First Trust Company of Philadelphia for the purpose of foreclosing a mortgage held by that company.

"11. That immediately prior to May 26, 1939, the corporation had issued three checks payable to the order of the Collector of Revenue of the State of Louisiana for $5,000.00 each, and said checks were in the process of collection at the time said corporation was placed in Federal receivership; that payment was stopped on the checks by the Receiver; that cash was in the bank at Shreveport to the credit of said Atlas Pipeline Corporation to take care of said checks at the time said Receiver was appointed; that said $15,000.00 was taken over by the Receiver, against which said checks were drawn, payable to the order of the Collector of Revenue, as set out herein, and used to purchase crude oil for the purpose of operating the receivership, or for other purposes of the receivership."

The applicable State statutes, in so far as levying of the taxes, method of collecting taxes, etc., are concerned, are enumerated in paragraph 4 of the stipulations above quoted and are found as Sections 8806 to 8826 of the Louisiana General Statutes by Dart, starting at page 486 of Volume 6 (1939), Act La. No. 6 of 1928, Ex.Sess., as amended, and pertinent Sections are as follows:

8806. "There is hereby levied a tax of four cents (4¢) per gallon on all gasoline or motor fuel, sold, used or consumed in the State of Louisiana for domestic consumption, to be collected as hereinafter set forth. * * *" Section 1, as amended by Act No. 34 of 1934, § 2.

8807. "The aforesaid tax of four cents per gallon shall be collectable from all persons, firms, corporations or associations of persons, engaged as dealers in the handling, sale or distribution of such products within the State of Louisiana, the method of collection to be as prescribed in Section 4 [8809] of this Act. The term 'dealer' as used in this Act is defined to mean any person, firm, corporation or association of persons, who produces, refines, manufactures, blends or compounds gasoline or motor fuel for sale to the jobber or consumer, or to the persons, firms, or corporations, or associations of persons, who in turn, sell to the jobber or consumer. * * The term 'dealer' is further defined to mean any person, firm, corporation or association of persons who sells, offers for sale, or has in his possession for sale, use, consumption or distribution, gasoline or motor fuel, as defined in this Act, and who cannot prove that the tax levied by this Act, has been previously paid on the said gasoline or motor fuel, or that the payment of said tax has been guaranteed by bond which has been furnished and accepted. The term 'dealer' is further defined to mean any person, firm, corporation or association of persons who uses, handles, distributes for use, or has in his possession for use or distribution * * * any gasoline [or motor fuel], including casinghead gasoline, which is subject to tax under this act, the tax on which he can not prove has been paid." Section 2, as amended by Act No. 413 of 1938, § 1.

8809 provides the manner in which the tax shall be secured and collected and the same is quoted in full:

"Payment of tax—Bond requirement—Delinquency—Forfeiture of right to do business.—Every person, firm, corporation or association of persons engaged as a dealer in the handling or distribution of gasoline or motor fuel for sale, use or consumption within the State, who has not furnished bond as provided in this Act, the furnishing of said bond being com-

pulsory, shall immediately upon the producing, refining, manufacturing, blending or compounding of any gasoline or motor fuel pay to the Supervisor of Public Accounts the tax levied herein, which is hereby made due and payable immediately upon said producing, refining, manufacturing, blending, or compounding; provided, further, that any dealer bringing gasoline or motor fuel into the State of Louisiana for sale, use, or consumption therein, who has not furnished bond as provided in this Act, the furnishing of said bond being compulsory, shall immediately pay to the said Supervisor of Public Accounts the tax levied herein which is hereby made due and payable immediately upon same coming within the boundaries of this State. Provided, further, that any person, firm, corporation or association of persons who sells, offers for sale, or has in his possession for sale, use, consumption or distribution gasoline or motor fuel as defined herein, the tax on which the said person, firm, corporation or association of persons cannot prove has been previously paid, or that the payment of said tax has been guaranteed by a bond which has been furnished and accepted, shall be liable for the tax thereon, as levied by this Act, and said person, firm, corporation or association of persons must qualify as a dealer before engaging in the said business. Said payments shall be made by remitting or paying to the Supervisor of Public Accounts by bank draft, post office or express money order, certified check, or cash. Provided, further, that it shall be the duty of each dealer, within twenty days after the expiration of each monthly period (to be computed from the first day of each month to the last day of each month), to file with the Supervisor of Public Accounts a statement, under oath, on forms prescribed and furnished by him, of the business conducted by such person, firm, corporation or association of persons during the last preceding monthly period, whether the tax has been paid or not, which statement shall show the number of gallons of gasoline or motor fuel that was sold to persons, firms, corporations or associations of persons within the State, and also the quantity used or consumed by the dealer importing same.

"Provided, further, that each and every dealer, as defined herein, shall furnish to the Supervisor of Public Accounts a satisfactory surety bond guaranteeing the payment of any and all taxes, penalties or costs levied by, accrued or accruing under this Act before engaging in the business of a dealer.

"It is hereby made compulsory for each and every 'dealer' under the provisions of this act to furnish satisfactory surety bond as above provided, before engaging in the business of 'dealer' in gasoline or motor fuel. Said bond having been furnished and accepted, as provided herein, the dealer furnishing same shall be required to pay the tax at the time of making reports to the Supervisor of Public Accounts, as herein required, only on such gasoline or motor fuel actually sold, used, or consumed in this State, during the period for which said reports are made and in which event the tax herein levied shall become delinquent the day after the date herein fixed for the filing of said reports. Provided, further, that the said bond shall be in an amount and of tenor and solvency satisfactory to the said Supervisor of Public Accounts and shall have been accepted by him. Provided, further, that the said bond shall not exceed in amount the total tax, penalty or costs, of the particular dealer for the last preceding three calendar months, or, if the dealer has had no tax penalties or costs for the period mentioned, the initial bond shall not exceed the amount of Ten Thousand ($10,000.00) Dollars. Provided, further, that any dealer who produces, manufactures, blends, compounds, or imports into the State of Louisiana, any gasoline or motor fuel for sale, use or consumption in the State of Louisiana in an amount, the tax on which will be in excess of the [a]mount of bond furnished by the said dealer to the Supervisor of Public Accounts, said dealer is hereby required to immediately furnish additional bond, as provided herein, to the said Supervisor of Public Accounts, to guarantee the payment of the tax which exceeds the amount of the bond previously furnished. In no case shall a dealer sell, use, distribute or consume gasoline or motor fuel unless the tax, penalties or costs have been guaranteed by bond furnished the Supervisor of Public Accounts, as provided herein. Provided, further, that any bond previously furnished the Supervisor of Public Accounts by any dealer, and accepted by said Supervisor of Public Accounts which later becomes unsatisfactory to him either as to amount or solvency, or both, the said Supervisor of Public Accounts shall call upon the said dealer to promptly furnish another and/or larger bond, with the same or other sureties sat-

isfactory to the said Supervisor of Public Accounts, as provided herein, and failing to do so, after five days (5) written notice to the said dealer, shall ipso facto cause all taxes levied under this Act against the said dealer to become delinquent and the Supervisor of Public Accounts shall forthwith proceed to collect the said taxes in the same manner as if no bond had ever been furnished and accepted, without, however, prejudicing or waiving any rights under any bond held by him to guarantee the payment of any tax, penalties or costs under this Act. Provided, further, that failure to pay any tax, penalties or costs accruing under this Act, or failure to furnish bond as provided in this Act, shall ipso facto make the said tax, penalties and costs delinquent and shall be construed as an attempt to avoid the payment of same which shall be sufficient grounds for attachment of gasoline or motor fuel wherever the same may be located or found, whether said delinquent tax payer be a resident or non-resident of this State, and whether said gasoline or motor fuel is in the possession of said delinquent tax payer or in the possession of other persons, firms, corporations or associations of persons; provided, that it is the intention of this Act to make the gasoline or motor fuel responsible for the payment of this tax together with penalties and costs, and authority to attach said gasoline or motor fuel is hereby specifically authorized and granted to the said Supervisor of Public Accounts. The procedure prescribed by law shall be followed except that no bond shall be required of the State. Provided further that failure to pay said tax and failure to furnish said bond as provided in this Section shall ipso facto, without demand or putting in default, cause said tax, penalties and costs to become immediately delinquent, and the Supervisor of Public Accounts, is hereby vested with authority to take a rule on the said dealer, by motion in a court of competent jurisdiction, to show cause in not less than two nor more than ten days, exclusive of holidays, after the service thereof, which rule may be tried out of term and in chambers, and shall always be tried by preference, why said dealer should not be ordered to cease from further pursuit of business as a dealer; and in case said rule is made absolute, the order thereon rendered shall be considered a judgment in favor of the State prohibiting such dealer from the further pursuit of said business until such time as he has paid the said delinquent tax, penalties and costs and in addition has furnished said bond, as herein provided, and every violation of the injunction shall be considered as a contempt of court, and punished according to law. When bond has been furnished by the dealer as provided in this Act, the surety on said bond may be joined in said rule with the dealer and condemned in solido for the amount of the tax, penalties, attorney's fees and costs.

"The Supervisor of Public Accounts is hereby authorized to employ private counsel to represent him in any proceeding under this Act that he may deem advisable." Section 4, as amended by Act No. 34 of 1934, § 4.

Section 8810 (section 5 of act 1928) deals with monthly statements, and Section 8811 provides: "It is the purpose of this Act to centralize the collection of the tax herein authorized in the hands of those who originally dispose of gasoline or motor fuel for distribution and consumption within this State as far as practicable; but if for any reason the dealer who first handles, sells, distributes, uses, etc., the gasoline or motor fuel, shall have escaped payment of the taxes herein levied, payment of said taxes may be required of any dealer in whose hands the aforesaid taxable commodities may be found, where it is evident the taxes have not heretofore been paid. * * *" Section 6, as amended by Act No. 335 of 1936, § 1.

Section 8812 (section 7 of act of 1928) authorizes the collector to require the furnishing of information by anyone handling motor fuel that may be "deemed necessary for purposes of collecting the tax, invoking court action, if necessary, and if the tax return previously furnished is found incorrect, to require a correct one within five days, in default of which the collector is authorized to seek an injunction without bond against further operation." Sections 8813 to 8818, inclusive (sections 7-A to 7-F added by Act No. 16 of 1932, § 2; section 7-E, as amended by Act No. 34 of 1934, § 6), provide other safeguards to insure collection and to prevent evasion of the tax; while Section 8819 (section 7-G, as added by Act No. 16 of 1932, § 2) fixes a penalty of not more than $1,000 fine and imprisonment not exceeding two years or both for violation of any provision of the law. Section 8820 (section 8, as amended by Act No. 8 of 1930, § 3)

adds a civil penalty of twenty per cent (20%), plus ten per cent (10%) attorneys fees, if the tax "becomes delinquent" within the terms of the statute. Section 8821 (section 9 of act 1928) authorizes the collector, in case of failure to make report by any dealer, to examine the latter's records and fix the amount of tax and to "add thereto the cost of such examination." Section 8822 (section 10 of the act) makes any false oath in connection with the matter perjury and punishable as such; and Section 8823 (section 11 of the act) provides that the receipt showing the payment of the tax upon form prescribed for the collector shall be "the only legal evidence showing payment." The remaining Sections, 8824 to 8826 (sections 13 and 14 of the act, and section 12, as amended by Act No. 8 of 1930, § 4), cover appropriations for enforcement, exemptions, etc., from the tax.

The main contention of counsel for the state or tax collector, is that the debtor was a fiduciary or agent for the collection of this tax, and is liable as such, with a lien, equitable or otherwise upon its property for payment; secondly, it urges the doctrine of "unjust enrichment", that is, that the debtor can not enrich itself at the expense of the state; thirdly, that the relation of the bondholders "to the corporation is equivalent to that of stockholders"; and, fourthly, that the tax is imposed for the privilege of doing business in the state, without which the debtor could not have operated in Louisiana.

 We begin with the rule that under the law, privileges and liens are stricti juris, and the person asserting them must point to some specific provision of the law for their existence. La.C.C. Art. 3185. I think it clear that this is an excise tax, imposed upon everyone at so much per gallon (Sec. 8806 above quoted), but that it is "collectable" from "dealers" (Sec. 8807). The word "dealer" is defined primarily, "to mean any person * * * who produces, refines, manufactures, blends or compounds gasoline or motor fuel for sale," but by subsequent clauses, is made wide enough to include any person who sells, or is in possession for sale, and consumes any of such fuel "upon which the tax has not been paid." Under the stipulations of facts in this case, there can be no question but that the debtor was a "dealer" within the meaning of the law, with respect to the gasoline upon which the tax claimed

was due, and was bound to pay it; and that the state had recourse to all of the remedies and safeguards thus provided, including the right to enjoin the future doing of business, had it seen fit upon failure to pay. But nowhere do I find any provision for a lien of any sort. On the contrary, the requirements, such as the giving of bond, making reports and penal provisions, were intended to prevent the loss of the tax through the obviously easy means of disposing of it or consuming the gasoline. The dealer is liable for the tax whether he collects an amount sufficient to cover it from those to whom he sells or not. It is true that if the dealer sells to a jobber, retailer, or filling station without paying the tax, it can be collected from such purchaser also as a dealer, within the meaning of that word as defined in the law, so long as the tax was not paid (Sec. 8807). No duty was imposed upon the dealers to collect anything for the state, but the burden was upon him to *pay* the tax, and as such, he or it became the debtor of the state the moment the relation to the motor fuel such as to require the payment under the statute. Nothing in the language of the law indicates a purpose to make any one dealer an agent of the state. See State v. Standard Oil Company, 190 La. 338, 182 So. 531; Daughtery v. Canal Bank, 180 La. 1003, 158 So. 366; Texas Company v. Wilkinson, D.C., 21 F. Supp. 771. Counsel for the first mortgage bondholders has referred to a case decided by the Supreme Court of the State, La.Sup., 196 So. 349, as holding that a "dealer" who has imported gasoline into the state owes the tax without regard to whether it has been sold or not. However, I have not had the benefit of this decision, since it has not been published. It is my view therefore that there is nothing to support the contention that the debtor in this case was the agent or fiduciary of the state. Neither do I believe that the other alleged equitable principles of unjust enrichment can apply. The tax collector dealt with the officers of the debtor in a matter as to which he was armed with all of the remedies and safeguards, which the law provides and could have, by exercising them, protected the state from loss, stopping operations, if necessary. He did not do this, and it would seem highly unjust and inequitable to mulct creditors, and especially those holding mortgages upon the real estate and other tangible property, by subordinating their rights to this claim, when they were not running

the enterprise and had nothing to do with the losses which finally precipitated the receivership and the present proceedings. If such a contention were sustained, then the rights of mortgage creditors could be seriously impaired through laxity of the tax collector, or collusion with the tax debtor over a period sufficient to consume a substantial portion of the estate, all without the knowledge of the mortgagees until collapse of the business.

I have examined the provisions of the deed of trust or mortgage, which the counsel for the state contends created a relation in the bondholders equivalent to that of stockholders, but find them to be nothing more than additional remedies to insure payment of these obligations, with an option to convert their claims into preferred stock if the holders saw fit. The management and control of the business of the debtor, nevertheless, remained in the stockholders and officers of the debtor, who exercised them up to the time of the receivership. Hence, I do not believe the authorities cited on this score are applicable to the facts of the present case.

The answer to the last contention, that is, that the debtor could not have done business in the state without paying the tax, I think, is to be found in the fact that while the collector had the right to prevent it, he did not exercise that power and this large indebtedness of $144,775.08 accrued unsecured (except to require a bond for about $70,000 of the indebtedness), and to allow the claim as a privilege or preference over creditors, particularly those holding mortgages, would be to impair the obligations of their contracts and to divest vested rights, in the absence of a previously existing valid statute, imposing such a lien, of which these creditors would have had to take notice, such as ad valorem taxes.

My conclusion is that the state has no lien and must be classified as an ordinary creditor. This applies equally to the funds which were in the hands of the debtor when taken over by the receiver.

### The Gilark-Cotton Valley Ten Mile Six-Inch Pipeline.

The facts have also been stipulated with respect to this matter and are in substance as follows: The mortgages, securing both the first and second bond issues, covered property both in Texas and Louisiana and were filed and recorded in Webster Parish, Louisiana on December 26, 1935. At that time, the iron pipe involved here was a part of the gathering system in Texas, and, admittedly was covered by the mortgages recorded there. Thereafter, it was taken up, additional rights of way (other than those described in either mortgage) were purchased in Webster Parish and this same pipe laid as a part of the gathering system in Louisiana. Under the law of Texas, even though removed from the ground, the pipe would remain subject to the mortgages in that state. The question here is, does it and the rights of way on which it is laid now come under the liens of these mortgages?

The matter is governed by the law of Louisiana. Mortgages, like other liens, are stricti juris, and can not be created by equitable considerations. Art. 3283 of the La.C.C.: "The mortgage only takes place in such instances as are authorized by law." See also Art. 3290; State v. Recorder of Mortgages, 34 La.Ann. 178; Succession of Benjamin, 39 La.Ann. 612, 2 So. 187; Anglin v. Kilbourne, 131 La. 186, 59 So. 116.

There is no question but that the mortgagor and mortgagee agreed and attempted to mortgage after acquired property in the present case, for they declared that the act should cover "pipelines now owned or hereafter constructed or acquired" as well as "easements, servitudes * * * which the corporation now has or which it may in the future have * * in and for the purposes of the business now or at any time hereafter conducted, * * * and all other property of the corporation used and useful in its business * * * and all other additions, accretions, easements, rights of way, fixtures * * * and appurtenances belonging or in any wise appertaining or that hereafter may appertain or belong to any of the premises. It is the intention and it is hereby agreed that all property acquired by the corporation after date hereof shall be as fully embraced within the provisions hereof and subject to the lien hereby created * * * as if the said property was now owned by the corporation and was so specifically described herein and conveyed hereby."

The Act 105 of the Legislature of 1924 authorized pipeline companies to borrow money and execute mortgages "for the construction or repair of pipelines * *", but nothing was said to affect the law of mortgages as it then and now exists in

the Articles of the Civil Code with respect to future property. Articles which are pertinent to the present issue, are as follows (quoting them in reverse order):

"3308. Future property can never be the subject of conventional mortgage."

"3307. A debtor may mortgage his whole *present* property or only a specific part; but in either case, it ought to be expressly enumerated, as is said in the preceding article."

"3306. To render a conventional mortgage valid, it is necessary that the act establishing it shall state precisely the nature and situation of each of the immovables on which the mortgage is granted."

"3304. After-acquired property.—If a person contracting an obligation towards another, grants a mortgage on property of which he is not then owner, this mortgage shall be valid if the debtor should ever after acquire the ownership of the property, by whatever right."

There does not appear to have been an adjudication of the exact point at issue here by any decision of the state court, at least counsel on either side have cited none and the court has been unable to find such, but in the case of Anglin v. Kilbourne et al., supra, the Supreme Court of Louisiana had under consideration the rights of one who had taken a mortgage on the undivided interest of two out of nine heirs in four specific tracts of land. The act of mortgage expressly provided that it should attach to the interest of these two heirs in the several tracts (which were described) when and if a partition was made. Subsequently, the property was partitioned and the mortgagors executed a second mortgage upon the property falling to them in favor of another party. The contest was as to which had the superior rights on the proceeds of the property received in the partition. After referring to Art. 1338 of the Civil Code, which expressly provides that all "mortgages, liens and privileges existing against one of the coproprietors, shall, by the mere fact of the partition, attach to the shares allotted to him * *." The court had this to say with respect to Article 3304 and 3308 above quoted: "If article 3308, prohibiting the mortgaging of future property, and article 3304, allowing the mortgaging of property of which the mortgagor is not yet owner, are read together, they mean that *future indefinite property* cannot be mortgaged, but that future definite property may. Now, there is no indefiniteness in an act by which several pieces of property are described, and the extent of the mortgagor's interest therein is stated, and the said interest is mortgaged, with the added agreement that, in case by a partition the undivided interest thus mortgaged becomes segregated, the mortgage is to rest upon the same interest as thus segregated." Anglin v. Kilbourne, 131 La. 186, 59 So. 116, 117 (Italics by the writer of this opinion)

The principle governing under Art. 3304 as to mortgages upon property which the mortgagor does not own, but which is specifically described, is the same as where one sells property which he does not own, i. e., if he thereafter acquires it, the title enures to the benefit of his vendee. However, I do not see that this helps mortgagees in the present case. The rights of way upon which the pipe was re-laid in Webster Parish, were not only not owned by the debtor when the mortgage was executed, but were not described therein, except by the indefinite inclusion of future property. No third person, such as the ordinary creditors in this case, could, upon examining the first and second mortgages, find any description of the present pipeline, and it would seem that they are in the same position as innocent third purchasers or mortgagees upon the faith of the public record. "Whatever is done in contravention of a prohibitory law is void, although the nullity be not formally directed." La.C.C. Art. 12.

Since the law expressly prohibits the mortgaging of future property, the rights of way subsequently purchased, upon which the pipe in question was laid, could not fall under the mortgages. It has become a part of the realty as an immovable by destination (La.C.C. Art. 468), unaffected by the lien which attached to it while situated on the land in Texas described in the mortgage.

For the reasons assigned, there should be judgment over-ruling the motion to strike, the petition of the State of Louisiana, filed on November 22, 1939; rejecting the claim of the state to a lien for the gasoline taxes; and decreeing that the Gilark-Cotton Valley ten mile six-inch pipeline does not come under the provisions of the first and second mortgages.

Proper decree should be presented.